

DA 06-0477

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 310

STATE OF MONTANA, DEPARTMENT OF REVENUE,

        Petitioner, Appellee and Cross-Appellant

   v.

PPL MONTANA, LLC,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV 2005-273
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robert L. Sterup (argued), Holland & Hart, LLP, Billings, Montana

      For Appellee and Cross-Appellant:

          Brendan R. Beatty (argued), Special Assistant Attorney General, Charlena
Toro, Special Assistant Attorney General, Montana Department of Revenue,
Helena, Montana

          C. A. Daw, Bosch, Daw and Ballard Chartered, Boise, Idaho

Argued and Submitted:  June 13, 2007

Decided:  December 4, 2007

Filed:

_____
                   Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     PPL Montana, LLC (PPLM) appeals from the decision of the Eighth Judicial District Court, Cascade County, denying PPLM's claim that the Montana Department of Revenue (DOR) deprived PPLM of constitutional equal protection when it assessed PPLM's property taxes. DOR cross-appeals from the District Court's determination to uphold the State Tax Appeals Board's (STAB's) decision to lower DOR's appraisal of PPLM's property.

¶2     We review the following issues on appeal:

¶3     Did DOR's property tax assessment deprive PPLM of constitutional equal protection?

¶4     Did the District Court correctly affirm STAB's decision to lower DOR's appraisal of PPLM's property?

### FACTUAL AND PROCEDURAL HISTORY

¶5     PPLM acquired most of the Montana Power Company's (MPC's) electric generation assets in 1999 as part of Montana's deregulation of its electric power industry. PPLM paid approximately $769,746,000 for 11 hydroelectric generation plants, a reservoir, the J.E. Corette Electric Generating plant, and partial interests in three coal-fired power plants, known as Colstrip units 1, 2, and 3.

¶6     DOR determined, pursuant to § 15-23-101(2), MCA, that PPLM was "operating a single and continuous property operated in more than one county . . . ." Accordingly, DOR "centrally assessed" PPLM's newly acquired property, rather than permitting the individual counties to assess that portion of PPLM's property within their jurisdictions.

2

¶7     DOR's administrative regulations require it to appraise the value of property owned by "centrally assessed companies," such as utilities, with the "unit method of valuation" "whenever appropriate." Admin. R. M. 42.22.111(1) (2007). DOR explains that it appraises utilities as a "unit" in light of the fact that the individual properties owned by utilities have no value, over and above their salvage value, except as integral parts of the very business in which they operate.

¶8     DOR applies the unit method of valuation to determine the utility's total value. DOR first considers the utility's tangible and intangible assets, regardless of where those assets may be located. Admin. R. M. 42.22.101(30)-(31) (2007). DOR then subtracts the utility's intangible personal property. Section 15-6-218, MCA; Admin. R. M. 42.22.110 (2007). DOR assigns a portion of the utility's total value to the utility's assets located in Montana based on the proportion of the utility's assets located in Montana as compared to the utility's total assets. Admin. R. M. 42.22.101(30)-(31) (2007). DOR considers that portion of the utility's value that it assigns to the utility's Montana-based assets to represent the "fair market value" of those assets for purposes of property taxes. *See* Admin. R. M. 42.22.121(1) (2007). DOR's appraisal must reflect "100% of [the property's] market value." Section 15-8-111, MCA.

¶9     DOR combines three valuation methods to appraise the utility's value as unit: the cost method, the income method, and the market method. Admin. R. M. 42.22.111(1) (2007). The cost method generally reflects what the utility paid for its assets or what it would have to pay to replace those assets. Admin. R. M. 42.22.112(1) (2007). The income method reflects the current value of the utility's historical or future income

3

streams. Admin. R. M. 42.22.114(1) (2007). The market method looks to the utility's stock value or the sale price for similar utilities in the past. Admin. R. M. 42.22.113 (2007). DOR uses its discretion to combine these various methods to arrive at a single value that best reflects the utility's fair market value. Admin. R. M. 42.22.111(1) (2007). DOR determines what weight to give to each method's result depending on such discretionary factors as whether the data that the particular method uses is sufficiently reliable. Admin. R. M. 42.22.111(2) (2007). DOR then, as described above, allocates to the utility's Montana-based assets that portion of the company's "unit value" that "represents the state's proper share of the market value of the centrally assessed company's operating property." Admin. R. M. 42.22.121(1) (2007).

¶10    DOR applied the unit method of valuation to PPLM's property to arrive at a total market value of PPLM's electric generation and pollution control equipment (PCE) for the years 2000, 2001, and 2002. Montana law classifies electric generation property and pollution control equipment separately as Class 13, § 15-6-156, MCA, and class 5, § 15-6-135, MCA, respectively, and declares different tax rates for these properties. DOR relied solely on the cost approach in the year 2000 to arrive at a market value of $706,736,726 for PPLM's electric generation property and $74,629,373 for PPLM's PCE, for a total fair market value of $781,366,099. DOR's data for its year 2000 assessment originated from PPLM's independently audited financial statements for 1999 and from PPLM's purchase price information for MPC's assets provided by PPLM's accountant, Delloite & Touche (D&T).

4

¶11    Another of PPLM's accountants, PricewaterhouseCoopers, later issued revised financial statements for the years 1999 and 2000. PPLM's revised financial statements included a different "book value" for its electric generation assets to reflect PPLM's "sale and lease-back" of its interest in Colstrip units 1, 2 and 3. PPLM had sold its interest in Coalstrip units 1, 2, and 3 to institutional investors and then immediately leased the properties back from those investors. PPLM analogized the sale and lease-back to a mortgage on a house, and argued that the arrangement had no effect on the actual market value of its assets for purposes of property taxes.

¶12    DOR determined that the sale and lease-back reflected a more accurate valuation of the Colstrip units, however, and, accordingly, raised its appraisal of PPLM's assets in 2001. DOR calculated a value of $769,234,685 for PPLM's electric generation property and a value of $69,240,822 for its PCE for a total fair market value of $838,475,507 in 2001.

¶13    DOR concluded in 2002 that it had sufficient income data from PPLM's operations to incorporate the income valuation approach into its assessment. DOR combined 10% of the income value approach with 90% of the cost approach to arrive at a value of $729,462,534 for PPLM's electric generating property, and a value of $93,401,040 for its PCE, for a total fair market value of $822,863,574.

¶14    PPLM challenged DOR's assessment of PPLM's electric generating property. PPLM and DOR attempted to negotiate a settlement over the next two years. The parties failed to reach a settlement, however, and PPLM appealed its tax assessments for the years 2000, 2001, and 2002 to STAB. PPLM challenged DOR's decision to assess

5

centrally its electric generation assets and DOR's ultimate valuation of those assets. PPLM also alleged that DOR had failed to exempt the proper amount of intangible personal property owned by PPLM, and that DOR had failed to classify the proper amount of its property as PCE. Lastly, PPLM alleged that DOR had deprived it of equal protection when it failed to equalize properly its property tax burden with other comparable electric generation facilities in Montana. PPLM pointed out that DOR had appraised other utilities—specifically Avista and Puget Sound Electric (PSE)—less on their comparable electric generation facilities.

¶15 STAB conducted hearings on April 26 through April 29, and June 3 through June 10, 2004 and issued its findings of fact and order on February 15, 2005. STAB concluded that DOR properly had determined that PPLM's electric generation facilities should be "centrally assessed." STAB disagreed with DOR's valuation, however, in light of the fact that DOR had relied on the sale and lease-back transaction as well as a short and anomalous income history.

¶16 STAB concluded that PPLM's taxable property value should be equal to $769,746,000 for all the years at issue as that was the fair market value that PPLM had reported to the Internal Revenue Service shortly after PPLM had purchased the property in 1999. STAB determined that DOR had calculated properly the intangible personal property exemption and the value of PPLM's class 5, PCE property. STAB then adjusted down the fair market value of PPLM's property for all three years. STAB declined to address the question of whether DOR had failed to equalize properly PPLM's property tax burden with that of similar utilities, however, in light of the fact that the question

6

involved property tax valuations of utilities not involved in the appeal and questions of constitutional law beyond its "normal purview."

¶17 DOR petitioned the District Court to review STAB's determination that PPLM's electric generation assets should be valued at $769,746,000, and to review STAB's subsequent adjustment of PPLM property's fair market value. PPLM petitioned the District Court to address the open question of whether DOR had assessed its property unequally in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article II, Section 4 of the Montana Constitution.

¶18 The District Court affirmed STAB's findings of fact and conclusions of law on all counts. The District Court also determined that DOR's assessment had not subjected PPLM to an unequal tax assessment in violation of its right to constitutional equal protection. DOR and PPLM appeal.

**STANDARD OF REVIEW**

¶19 We review a District Court's order affirming or reversing an administrative decision of STAB to determine whether the findings are clearly erroneous, and whether the agency correctly interpreted the law. *O'Neill v. Department of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, ¶ 10, 49 P.3d 43, ¶ 10. We review a district court's conclusions of law to determine whether those conclusions are correct. *Dukes v. Sirius Const., Inc.*, 2003 MT 152, ¶ 11, 316 Mont. 226, ¶ 11, 73 P.3d 781, ¶ 11.

**DISCUSSION**

¶20 *Did DOR's property tax assessment deprive PPLM of constitutional equal protection?*

7

¶21 PPLM argues that DOR has appraised its property at higher values than other similarly situated electric generation properties located in Montana. PPLM alleges, for example, that DOR has appraised PPLM's Thompson Falls dam at a slightly higher value than Avista's Noxon Rapids Dam, despite the fact that PPLM's Thompson Falls dam produces approximately one-seventh the electricity of Avista's Noxon Rapids Dam. PPLM also points out that DOR appraised its assets in tax year 2000 for almost $300 million more than the value that DOR had appraised those same assets at in 1999 when they were in the hands of MPC. PPLM alleges that DOR's inequitable treatment of its property compared to other similar properties deprives it of equal protection as guaranteed by the Equal Protection Clause of the United States Constitution and Article II, Section 4 of the Montana Constitution.

¶22 DOR explains that PPLM's relatively higher property tax burden derives from the fact that DOR did not appraise PPLM's property based on the fair market value of each individual piece of PPLM's property, such as an individual dam. DOR appraises PPLM's property using the "unit method of valuation." DOR uses the unit method of valuation method to determine the fair market value of PPLM as a "unit." DOR then proportionally allocates PPLM's total market value among its various assets. DOR explains that the relatively higher appraisal values of PPLM's properties as compared to Avista's and PSE's similar properties arise from the fact that these three companies have different total market values as a unit and, thus, their individual properties also will have different market values despite the fact that the individual properties may be similar physically.

¶23 DOR suggests that MPC's generation assets are considerably more valuable in the hands of PPLM because the Federal Energy Regulatory Commission has granted PPLM status as an exempt wholesale generator (EWG). An EWG is not subject to regulation by a state's public utility regulatory agency. An EWG may sell its electricity at whatever price the wholesale market will bear. And an EWG's profits are unrestricted by state regulation. Regulated utilities such as Avista, PSE, and the former MPC, on the other hand, have a limited opportunity to sell their electricity on the wholesale market and their profits are subject to state regulation. DOR asserts that PPLM's relatively higher unit value stems from the fact that MPC's electric generation facilities are worth more in PPLM's unregulated hands than those assets would be worth in a non-EWG's regulated hands. DOR points out that PPLM earned considerably higher profits than PSE and Avista for the tax years at issue.

¶24 We held in *Western Union Tel. Co. v. State Board of Equalization*, 91 Mont. 310, 7 P.2d 551 (1932), that the "unit method of valuation" passes scrutiny under the Equal Protection Clause of the United States Constitution. *Western Union*, 91 Mont. at 325, 7 P.2d at 554. Western Union owned and operated a worldwide network of telegraph lines, including a portion located in Montana. *Western Union*, 91 Mont. at 319, 7 P.2d at 551-52. Western Union argued that the State Board of Equalization (SBE) erroneously had determined its Montana property taxes. *Western Union*, 91 Mont. at 321, 7 P.2d at 552.

¶25 SBE had appraised the value of Western Union's Montana telegraph wires based on the total value of Western Union's worldwide telegraph system. *Western Union*, 91 Mont. at 320, 7 P.2d at 552. SBE first divided the total mileage of telegraph wire that

9

Western Union owned in Montana by the total mileage of telegraph wire that Western Union owned worldwide. SBE then multiplied this proportion by the total value of Western Union's worldwide system to determine the fair market value of Western Union's Montana assets. *Western Union*, 91 Mont. at 320, 7 P.2d at 552.

¶26    SBE had included "37,563 miles of submarine cables lying and being in the oceans of the world . . . ." in its calculation of the value of Western Union's worldwide system. *Western Union*, 91 Mont. at 320, 7 P.2d at 552. SBE's inclusion of the ocean cables raised the value of Western Union's worldwide system, and correspondingly, the value of its share of Montana cables in the worldwide system. Western Union challenged SBE's consideration of its ocean cables in the appraisal, in part, on equal protection grounds. *Western Union*, 91 Mont. at 320-21, 7 P.2d at 552.

¶27    This Court upheld the SBE's inclusion of the ocean cables noting that the SBE may consider "any value which that property has that is attributable to the fact that it is used in connection with and as part of an entire plant or system operated both within and without the state . . . ." *Western Union*, 91 Mont. at 323, 7 P.2d at 553. The Court explained that the "true and actual value of plaintiff's property is something more than an aggregation of the values of separate parts of it, operated separately, 'it is the aggregate of those values, plus that arising from a connected operation of the whole; and each part contributes, not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole." *Western Union*, 91 Mont at 324, 7 P.2d at 553 (quoting *Western Union Tel. Co. v. Taggart*, 163 U.S. 1, 16 S. Ct. 1054 (1896)).

10

¶28     The Court concluded with regard to the federal Equal Protection Clause that the plaintiff's constitutional claims were "wholly without merit . . . ."  The Court explained that "[i]t is now settled by a long line of decisions that . . . the equal protection clause is not violated by prescribing a different rule of taxation for [railroads, utilities, etc.] than for concerns engaged in other lines of business."  *Western Union*, 91 Mont at 325, 7 P.2d at 554.  The Court concluded that the federal Equal Protection Clause does not prevent a State from assessing taxes on a company's property based on the use to which a company puts those assets in its larger system or business.

¶29     We can see no reason—and PPLM suggests none—as to why an analysis pursuant to Article II, Section 4 of the Montana Constitution would require a different result.  We have drawn no distinction between the protections offered by Article II, Section 4 of the Montana Constitution and those offered by the Equal Protection Clause of the United States Constitution when analyzing alleged discrimination between similarly situated taxpayers.  *Roosevelt v. Montana Dept. of Revenue*, 1999 MT 30, ¶¶ 16-46, 293 Mont. 240, ¶¶ 16-46, 975 P.2d 295, ¶¶ 16-46; *Kottel v. State*, 2002 MT 278, ¶ 47, 312 Mont. 387, ¶ 47, 60 P.3d 403, ¶ 47; *Montana Dept. of Revenue v. Barron*, 245 Mont. 100, 111, 799 P.2d 533, 540 (1990); *see also* 71 Am. Jur. 2d § 340 (2007) (explaining that there is nothing in the unit method of valuation that is inherently opposed to either the federal or the various state constitutions); *Beaver County v. Wiltel, Inc.*, 995 P.2d 602, ¶¶ 24-26 (Utah 2000) (holding that central assessment by the unit method of valuation did not violate the Equal Protection Clause of the United States Constitution or the "uniform operation of laws provision" in the Utah constitution).

11

¶30    Most of PPLM's arguments amount to an invitation for this Court to reconsider the long-settled constitutionality of the unit method of valuation. PPLM argues, for example, that DOR has applied the unit method of valuation to assess the electric generation assets of PPLM, PSE, and Avista based on the value that those assets have in the hands of the individual utilities rather than the value that those assets would have as individual properties on the open market. PPLM points to the fact that its assets were valued at $300 million less in the hands of MPC. PPLM also contends that its tax burden on its electric generation property has increased by 82% over the years from 1999-2002, while the tax burden on PSE's and Avista's electric generation property has declined. PPLM concludes that DOR's unit method of valuation amounts to a prima facie deprivation of equal protection.

¶31    We already have approved of the fact, however, that the unit method of valuation inherently values a property based on its value in the hands of its current owner. *Western Union*, 91 Mont. at 324, 7 P.2d at 553. Our precedents recognize that the fair market value of a piece of property, that is an integral part of a larger system, derives from its value as a part of the larger system. *Western Union*, 91 Mont. at 324, 7 P.2d at 553. We recognize that for such systems the "value-in-use" of the particular piece of property equates to the fair market value of that property for property tax purposes. *Western Union*, 91 Mont. at 324, 7 P.2d at 553. We find nothing constitutionally significant in the bare fact that DOR appraises the fair market value of the same electric generation assets differently when those assets are owned by different utilities.

12

¶32 PPLM also argues, however, that DOR has applied the otherwise constitutional unit method of valuation in a discriminatory manner. PPLM asserts that DOR created an irrational classification between utilities that qualify as EWGs and the more traditional regulated utilities. PPLM also asserts that DOR applied the unit method of valuation in a manner that amounts to an impermissible "welcome stranger" assessment as held unconstitutional in *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 109 S. Ct. 633 (1989). We address each argument in turn.

¶33 The basic rule of equal protection "is that persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Rausch v. State Compensation Ins. Fund,* 2005 MT 140, ¶ 18, 327 Mont. 272, ¶ 18, 114 P.3d 192, ¶ 18. We have held that "the first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." *Powell v. State Compensation Ins. Fund,* 2000 MT 321, ¶ 22, 302 Mont. 518, ¶ 22, 15 P.3d 877, ¶ 22.

¶34 PPLM alleges that Avista, PSE, and PPLM all are similarly situated with respect to the purpose of the law at issue. The unit method of valuation as described in DOR's administrative regulations constitutes the law at issue. Admin. R. M. 42.22.101(30) (2007), explains that the unit method of valuation "is a method for determining the market value of a centrally assessed company." Section 15-23-101, MCA, defines centrally assessed company as "a corporation or other person operating a single and continuous property operated in more than one county or more than one state . . . ." DOR's regulations explain that the unit method of valuation "involves appraising, as a

13

going concern and as a single entity, the entire unit, wherever located, then deducting the intangible personal property value and then ascertaining the part thereof in this state." Admin R. M. 42.22.101(30) (2007). This regulation serves to determine the market value of a company that owns property operated as a single system throughout more than one county or state. Section 15-23-101, MCA. We agree that Avista, PSE, and PPLM all are similarly situated with respect to this law in that they all operate electric generation properties as a system over more than one county or state.

¶35    We cannot conclude under these circumstances, however, that DOR has treated PPLM, Avista, and PSE in an unequal manner. PPLM admits that DOR "did not consider, evaluate, or otherwise take into account, in any fashion, . . . [the extent to which PPLM, Avista, or PSE participated in wholesale markets] when assessing PPLM's properties in 2000-2002." PPLM's admission makes sense in light of the fact that DOR appraised the value of PPLM primarily on the value that PPLM paid for its generation assets and, to some extent, the income that PPLM generated from those assets. Whether PPLM, Avista, or PSE participated in wholesale markets played no direct role in DOR's appraisal of these utilities. STAB concluded, in fact, that "DOR utilized the same methodology and approach in appraising the Montana taxable properties owned by PPLM, Puget, and Avista." PPLM does not challenge this finding on appeal.

¶36    DOR—along with the District Court—suggests that PPLM's higher unit value probably derives from the fact that PPLM operates as an EWG and, thus, operates in a comparatively more profitable regulatory environment. DOR's speculation as to the reason for PPLM's higher value as a going concern, however, does not amount to

14

unequal treatment of Class 13 utilities. DOR has treated all the utilities at issue similarly by calculating their value based on its analysis of the cost, market and income indicators, regardless of whether the utilities' status as an EWG or a non-EWG raises or lowers the value of those indicators. The record fails to support PPLM's allegation that DOR has singled out PPLM for unequal treatment.

¶37    PPLM nevertheless insists that the "undeniable" effect of DOR's application of the unit method of valuation in this case amounts to the "welcome stranger" method found constitutionally impermissible in *Allegheny*. The county tax assessor in *Allegheny* taxed property within the county based solely on the value for which the most recent owner had purchased the property, regardless of the property's present market value. *Allegheny*, 488 U.S. at 338, 109 S. Ct. at 635. The assessor's method "systematically produced dramatic differences in valuation between petitioners' recently transferred property and otherwise comparable surrounding land." *Allegheny*, 488 U.S. at 341, 109 S. Ct. at 637. The Court found that this treatment violated constitutional equal protection, noting that the petitioner's property "has been assessed at roughly 8 to 35 times more than comparable neighboring property." *Allegheny*, 488 U.S. at 344-46, 109 S. Ct. at 638-39.

¶38    PPLM asserts that DOR—as well as STAB—likewise based its unit valuation of PPLM entirely on the price at which PPLM purchased MPC's generation assets. PPLM explains that DOR valued the electric generation assets under MPC at their historic cost minus depreciation, while DOR valued the same assets pursuant to PPLM's more recent purchase. PPLM also alleges that DOR valued Avista's and PSE's properties using their

15

historical cost minus depreciation. PPLM contends that DOR's decision resulted in a valuation of its electric generation assets at almost $800 million. By contrast, DOR valued those same assets at only around $500 million in the previous year, under the ownership of MPC. PPLM alleges that DOR's focus on the cost factor when it applied the unit method of valuation amounts to the "welcome stranger" method found unconstitutional in *Allegheny*.

¶39 DOR's method bears little resemblance to the method used in *Allegheny*. DOR did not appraise PPLM solely based on its purchase price. DOR considered the price that PPLM paid for its assets, the income that PPLM earned from its assets, and what similar assets might sell for on the open market. Admin. R. M. 42.22.111(1) (2007). DOR relied on PPLM's purchase price only after DOR had determined that PPLM's purchase price represented the most accurate indicator of the current market value of PPLM's assets. DOR's method requires it to use the most accurate indicators as they become available. Admin. R. M. 42.22.111(1) (2007). DOR, for example, in part, relied on PPLM's income for its 2002 appraisal. The County assessor in *Allegheny*, to the contrary, relied solely on the purchase price of the property at issue and completely disregarded any other indicators of market value. *Allegheny*, 488 U.S. at 340, 109 S. Ct. at 636.

¶40 PPLM has failed to demonstrate that DOR's initial reliance on purchase price will result in the type of systematic undervaluation of property that the Court determined unconstitutional in *Allegheny*. PPLM points only to the absolute difference in the assessed value of its property as compared to the assessed value of Avista's and PSE's

16

property. We already stated above, however, that similar pieces of property likely will be valued differently under the unit method of valuation in light of the fact that DOR values an individual property based on the total market value of the system in which that property operates. We would expect that PPLM's electric generation dam would be valued differently than a comparable dam owned by Avista or PSE as both the utilities likely are to have a different total market value, especially in light of the fact that PPLM operates as EWG, while PSE and Avista operate as regulated utilities.

¶41 We conclude that the District Court correctly determined that PPLM has failed to establish that DOR's use of the unit method of valuation deprives PPLM of constitutional equal protection. *Dukes,* ¶ 11. PPLM mistakenly focuses on the fact that DOR appraised its properties at different values than other centrally assessed utilities. Its argument founders on the fact that DOR does not tax properties owned by utilities based on the sum of their properties' respective market values, independent of the system in which the properties operate. DOR taxes Montana properties owned by utilities based on the value of the system in which those properties operate. Admin. R. M. 42.22.101(30) (2007). Courts long have considered the constitutional validity of the unit method of valuation as settled law. *Western Union*, 91 Mont at 325, 7 P.2d at 554. We decline PPLM's invitation to revisit the constitutionality of the unit method of valuation here. PPLM also has failed to show that DOR has applied the unit method of valuation in a manner that discriminates against its status as an EWG or in a manner that intentionally and systematically undervalues similarly situated properties.

17

¶42    *Did the District Court correctly affirm STAB's decision to lower DOR's appraisal of PPLM's property?*

¶43    DOR alleges first that the District Court erred in affirming STAB's decision to ignore PPLM's sale and lease-back transaction in its valuation of PPLM's electric generation assets. DOR asserts that the sale and lease-back transaction constituted an integral part of PPLM's purchase of MPC's electric generation assets. DOR argues that STAB substantially undervalued PPLM's assets when it failed to consider the sale and lease-back's effect on the value of PPLM's property.

¶44    STAB found that the sale and lease-back served "to secure necessary financing for PPLM." STAB determined that "the sale lease-back was nothing more than a financing mechanism and added no additional value to the property." STAB concluded that "there is insufficient support to suggest this transaction increased the value of the property."

¶45    We defer to STAB's findings unless they are clearly erroneous. *O'Neill,* ¶ 10. We previously have stated that "[t]ax appeal boards are particularly suited for settling disputes over the appropriate valuation of a given piece of property, and the judiciary cannot properly interfere with that function." It is not our function "to act as an authority on taxation matters." *Dept. of Revenue v. Grouse Mt. Development*, 218 Mont. 353, 355, 707 P.2d 1113, 1115 (1985).

¶46    DOR argues that STAB erred in failing to recognize that the sale and lease-back transaction represents a single transaction for taxation purposes. DOR fails to explain, however, why treating the sale and lease-back as part of the purchase instead of a separate transaction undermines STAB's finding that the sale and lease-back constituted

18

a financing scheme that had no effect on the fair market value of the property. We cannot conclude under these circumstances that STAB's finding is clearly erroneous. *O'Neill,* ¶ 10.

¶47 DOR argues, in the alternative, that STAB failed to account for $40 million in investments that PPLM made to its electric generation assets between 2000 and 2001. DOR asserts that STAB accidentally removed these investments when it excised the value of the sale and lease-back transaction from DOR's appraisal. DOR explains that without these investments STAB has underestimated the fair market value of PPLM's assets for the years 2001 and 2002.

¶48 PPLM counters that DOR failed to raise this argument in the District Court. DOR alleged in the District Court that STAB had ignored several "material changes" in PPLM's assets that occurred in 2001 and 2002, including significant income earned by the property, investment, depreciation, and amortization of liabilities PPLM assumed in its purchase of the assets. DOR made no attempt, however, to direct the District Court to the magnitude of these "material changes" or explain in any detail what effect they might have on PPLM's fair market value for the 2001 and 2002 tax years. DOR stipulated to STAB's finding that the parties did not establish at trial the liabilities that PPLM assumed in its purchase of MPC's electric generation assets.

¶49 DOR now asks this Court to review STAB's alleged failure to account for PPLM's $40 million in investments. DOR directs this Court's attention to various minutiae in STAB's accounting calculations and explains their significance in detail. We decline to second guess the District Court on tax accounting details, however, that it never had a fair

19

chance to consider. *Ford v. State*, 2005 MT 151, ¶ 12, 327 Mont. 378, ¶ 12, 114 P.3d 244, ¶ 12. Moreover, we agree with the District Court that DOR essentially waived this argument when it stipulated that a portion of these "material changes" were not established at trial.

¶50    Affirmed.


/S/ BRIAN MORRIS


We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRAD NEWMAN
District Court Judge Brad Newman
sitting for Chief Justice Karla M. Gray


Justice John Warner concurs.

¶51    I concur in the result of the Court's opinion, but not with all that is stated therein. PPLM complains that it is a violation of equal protection for DOR to appraise its property as worth more than the comparable properties owned by PSE and Avista. PPLM is correct that the electrical generating plants owned by PSE and Avista are not assessed at the value they would bring on the open market in a sale between a presumed willing buyer and a presumed willing seller. The fair market value of a specific piece of property will not be less than a willing buyer will pay for it on the open market. If the owner of the property is willing to sell it, such owner might demand more for the property than a willing buyer offers, but

20

surely the owner will not demand less than the offer. The price that PPLM recently paid for one-half of the Colstrip units in question is indeed powerful evidence of the value of PSE's one-half interest in the same generating plants.

¶52 However, Montana tax law provides that in the present instance the properties of PPLM, PSE and Avista are not necessarily "comparable property." Thus, the law provides that these properties need not be assessed equally. Section 15-7-112, MCA, says:

> The same method of appraisal and assessment shall be used in each county of the state to the end that *comparable property with similar true market values* and subject to taxation in Montana shall have substantially equal taxable values at the end of each cyclical revaluation program hereinbefore provided. [Emphasis added.]

¶53 Section 15-1-101(1)(e), MCA, states:

> The term "comparable property" means property that:
> (i) has similar use, function, and utility;
> (ii) is influenced by the same set of *economic trends* and physical, *governmental*, and social *factors*; and
> (iii) has the potential of a similar highest and best use. [Emphasis added.]

¶54 As the District Court aptly concluded, because PPLM operates in an unregulated market, whereas PSE and Avista operate in regulated markets, their properties are not necessarily "comparable" under Montana law because they are not "influenced by the same set of economic trends and . . . governmental . . . factors[.]" The District Court explained in detail:

> However, under the regulatory status quo, the electric generation properties of PPLM and PSE/Avista are <u>not</u> currently subject to, and influenced by, the same set of regulatory and economic restrictions, factors, and environment. PPLM and PSE/Avista operate in substantially different regulatory and economic environments. As an EWG, PPLM may sell an unlimited amount of power on the wholesale market for profit at market rates. In the regulated environment in which they operate, PSE and Avista may not profit above the

21

reasonable rate of return that state regulatory agencies authorize them to recover on their investments. Consequently, PPLM's Montana electric generation assets have been substantially more profitable and have substantially more profit-potential than those of PSE/Avista under the regulatory status quo.

¶55 While PPLM complains the District Court erred in determining that their property was not comparable with that of PSE and Avista, the District Court's conclusion was based on the law.

¶56 The basic rule of equal protection is that "persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Rausch v. State Compen. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, ¶ 18, 114 P.3d 192, ¶ 18. By enacting the above referenced statutes, which define what may be considered "comparable property," the legislature has, in effect, provided that property owned by a regulated utility may be appraised at a lesser value for tax purposes than that same property owned by an unregulated utility. Thus, the legislature has determined that PPLM, PSE and Avista are not similarly situated and there is no equal protection violation. Like many things in the law of taxation, the disparate valuation of the properties in question may not be entirely logical. But, as noted by the District Court, there is a rational basis for the different valuations and they are not illegal.

¶57 While assigning a greater value to PPLM's properties than to PSE's or Avista's property creates a fictional result, DOR's valuation is not a violation of equal protection. Therefore, I must concur in the result of the Court's decision.

/S/ JOHN WARNER

22

Justice Jim Rice concurring.

¶58    I agree with the conclusion reached in Justice Warner's concurrence that the statutes permit the distinctions which were drawn by the DOR between the utility properties at issue here.  I would only note that the Legislature did not *mandate* that such particular distinctions be made, but, rather, *authorized* them to be made pursuant to the very broad discretion regarding the assessment of this tax which it delegated to DOR.   The breadth of this discretion is quite notable.

¶59    The citizenry may assume that the Legislature sets tax levels for major corporations, but, as this case illustrates, that may be true only in a broadly general sense.  Under the DOR's "unit method of valuation," including the application of such factors as trending indices, depreciation and use analyses, the DOR unilaterally increased PPL's property value assessment by a phenomenal 50 percent in one year—with corresponding increases in PPL's tax bill.  I say that the DOR acted "unilaterally" because this large tax increase was accomplished without the passage of any legislation by the Legislature for the purpose of increasing taxes in this manner.  Indeed, not a single legislative vote was cast.  Significant impacts such as this may explain why the bureaucracy has been referred to by some as "the fourth branch of government."  As with any broad delegation of authority, there is a potential for abuse.

¶60    DOR defends its currently employed version of the unit method of valuation and argues it is constitutional.  I do not necessarily disagree, but in my view that is not the real issue here.  The issue is whether the DOR, in applying the factors *within* the unit method, has exercised its discretion in a way that offends equal protection.  However, PPL's challenge,

23

which focuses on the outcome—that is, the disparities in the respective tax bills of the utilities involved—simply has not proved a violation of equal protection premised upon a misapplication of the unit method's factors. PPL does not contest STAB's finding that DOR used an equal approach in applying the unit method to assess the properties owned by PPLM, Puget and Avista. Given that there is no dispute over this factual finding, I concur in the Court's decision to affirm. Whether a challenge focused upon DOR's application of individual factors within the unit method of valuation would establish a constitutional violation is a question which may be raised another day.


/S/ JIM RICE