No. 04-116

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 316

STEVE M. ROY and FELICIA A. ROY, Individually and as
parents and guardians of PATRICK ROY and BRANDON ROY,

      Plaintiffs and Appellants,

   v.

BLACKFOOT TELEPHONE COOPERATIVE, INC.,

      Defendant and Respondent.

APPEAL FROM:    The District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 2001-664,
Honorable John S. Henson, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Cynthia K. Smith, Smith Law Offices, PC, Missoula, Montana

            Kathleen O'Rourke Mullins, O'Rourke Mullins Law Office,
St. Ignatius, Montana

      For Respondent:

            Kelly M. Wills and Kathleen L. DeSoto, Garlington, Lohn & Robinson,
PLLP, Missoula, Montana

Submitted on Briefs:  October 14, 2004

Decided:  November 12, 2004

Filed:

_____
                    Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Steve Roy appeals from the District Court's grant of summary judgment and denial of his motion to alter or amend the judgment. Felicia A. Roy and their children brought attendant claims for loss of consortium. We affirm the judgment of the District Court.

¶2 We restate the issues on appeal as:

¶3 1. Whether Blackfoot failed to properly train Roy in the use of aerial ladders.

¶4 2. Whether Blackfoot had a policy requiring the use of safety belts on ladders prior to Roy's injury.

¶5 3. Whether industry standards and OSHA regulations gave notice to Blackfoot that there was a high probability Roy would be injured if he did not use a safety belt on aerial ladders.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Steve Roy worked for Blackfoot Telephone Cooperative for over twenty years. For most of that time Roy's position was that of an installation and repair technician, commonly referred to as a "lineman." In 1998 Roy moved to Plains, Montana, and began performing mid-span aerial work. Mid-span work involves repairing lines between telephone poles with the assistance of an aerial ladder or bucket truck.

¶7 Per Blackfoot's safety requirements, Roy regularly attended safety classes and was regularly provided with literature on safety. Blackfoot also gave Roy some safety equipment, such as a hard hat and an extension ladder. He was not provided with a safety belt for use on aerial ladders, although he was provided with a telephone pole climbing belt.

2

In his deposition Roy stated that he had never used a safety belt while climbing an aerial ladder, nor had he ever seen anyone else use one. He also stated that he knew if he needed a bucket truck to assist him in his mid-span work then one would be brought to him upon request. A bucket truck allows a worker to reach a telephone line without the dangers involved when using a ladder.

¶8 On May 5, 1999, Roy fell 18 feet from an aerial ladder, breaking his neck and sustaining numerous other injuries. He had not requested a bucket truck for that day's work because he believed that he did not need one. As a result of the accident, Roy can no longer work. Both parties agree that if Roy had been wearing a safety belt he very likely would not have fallen off of the ladder. A post-accident report undertaken by Blackfoot noted that Roy should have been restrained "by a harness or positioning belt."

¶9 The same person who authored the report, James Harper, was unclear in his deposition whether Blackfoot had a policy requiring the use of safety belts on aerial ladders before Roy's fall. However, Roy's supervisor, Al Williams, unequivocally stated that Blackfoot did not have such a policy. Both sides to this litigation investigated whether other telephone companies require the use of safety belts or bucket trucks for their linemen. Roy submitted evidence that most other companies in Montana and in the region require one of the two methods, while Blackfoot submitted evidence that at least two other companies in the region do not require their linemen to use those methods.

¶10 Roy brought suit against Blackfoot for his injuries. After a period of discovery, Blackfoot moved for summary judgment, arguing that since Roy did not meet the malice

3

standard of *Sherner v. Conoco, Inc.*, 2000 MT 50, 298 Mont. 401, 995 P.2d 990, he was bound by the exclusive remedy of the workers' compensation act. The motion was granted. Roy's motion to alter and/or amend the judgment was denied. Roy now appeals.

**STANDARD OF REVIEW**

¶11     We review a grant of summary judgment *de novo*. *Grassy Mountain Ranch Owners' Ass'n v. Gagnon*, 2004 MT 245, ¶ 7, 323 Mont. 19, ¶ 7, 98 P.3d 307, ¶ 7. To meet its initial burden, the movant must demonstrate that, viewing the evidence in the light most favorable to the non-moving party, there exists no genuine issue of material fact. *Fulton v. Fulton*, 2004 MT 240, ¶ 6, 322 Mont. 516, ¶ 6, 97 P.3d 573, ¶ 6. Once the movant does this, the burden shifts to the non-moving party, which then must establish that a genuine issue of material fact exists, and must do so with more than mere denial and speculation. *Fulton*, ¶ 6. Once the court concludes that no genuine issue of material fact exists, it must then determine whether the moving party is entitled to judgment as a matter of law. On review we determine whether the District Court correctly applied the law. *See Chain v. State, Dept. of Justice, Motor Vehicle Div.*, 2004 MT 216, ¶ 8, 322 Mont. 381, ¶ 8, 96 P.3d 1135, ¶ 8.

¶12     Roy points to four factors which illustrate that Blackfoot knew there was a high probability that he would be injured and nevertheless acted in conscious disregard of or indifference to that knowledge: it (1) failed to train Roy in ladder safety, (2) had a policy requiring the use of safety belts on ladders, (3) disregarded the applicable industry standard, and (4) disregarded OSHA regulations requiring the use of safety belts. We determine that Roy has failed to raise a genuine issue of material fact concerning whether Blackfoot's

4

actions were intentional and malicious under the *Sherner* standard.  We examine Roy's arguments in turn.

## DISCUSSION

## ISSUE ONE

¶13    *Whether Blackfoot failed to properly train Roy in the use of aerial ladders.*

¶14    Before we proceed with Roy's argument concerning safety training, and with the other three arguments Roy raises, we must first establish the standard that Roy must meet in order to recover damages.  In most circumstances a workers' compensation claim is the exclusive remedy for an employment-related injury claim such as Roy's.  *See* § 39-71-411, MCA.  However, an exception exists under § 39-71-413, MCA, for injuries that are caused intentionally.  Given the timing of Roy's injury, the 1999 version of § 39-71-413, MCA, is at issue here.  That version provided that an injured worker has a cause of action if he "receives an injury while performing the duties of his employment and the injury or injuries so received by the employee are caused by the intentional and malicious act or omission of a servant or employee of his employer . . . ."

¶15    In *Sherner* we interpreted the meaning of "malice" and "intentional."  We adopted the definition of "malice" provided at § 27-1-221(2), MCA, which states:

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

5

We interpreted "intentional" according to its plain meaning: "'1. done deliberately; intended. 2. having to do with intention.'" *Sherner*, ¶ 36 (quoting *The American Heritage Dictionary of the English Language, Third Edition* (1996)). This plain meaning comports with the word's use in § 27-1-221(2), MCA. Therefore, to meet the standard of *Sherner* an injured worker must satisfy the definition of malice in § 27-1-221(2), MCA.

¶16    Additionally, we have strictly interpreted the requirement that the injury be of a "high probability." Recently, we stated that "[t]he malice standard requires more than a showing that the job in question involves a known risk of injury or a dangerous situation. The standard requires that the employer actually knew of, or intentionally disregarded, a probability of injury that is higher than that caused by gross negligence. Here, there is simply no evidence the companies knew their employees would actually be injured by a routine which was usually performed without incident." *Olszewski v. BMC West Corp.*, 2004 MT 187, ¶ 19, 322 Mont. 192, ¶ 19, 94 P.3d 739, ¶ 19. Roy argues that "high probability" does not refer to the high probability of an injury as such, but to the high probability of serious injury *if* an accident occurs. However, the above language of *Olszewski* tells us that "high probability" refers to both the accident and the injury. What is at issue, of course, is whether Blackfoot acted with intentional indifference to or disregard of knowledge that there was a high probability of injury, as opposed to knowledge that there was a high probability of injury if something occurred that itself *was not* of a high probability. *See Olszewski*, ¶ 19 ("usually performed without incident"). If there was not a high probability of Roy's falling off a ladder, or if Blackfoot did not know there was such a probability, then Roy does not

6

satisfy the *Sherner* standard. Put another way, to meet the *Sherner* standard Blackfoot must have known there was a high probability that Roy would be injured in working on an aerial ladder without a safety belt.

¶17    Having established the *Sherner* standard, we shall move on to the questions of Roy's training. It is undisputed that Blackfoot did not train Roy in the use of a safety belt. It is also undisputed, however, that Roy regularly attended Blackfoot's safety training sessions. Roy never requested training in the use of safety belts, and Roy was issued a belt to be used in climbing telephone poles. Blackfoot's failure to instruct Roy on the use of ladder safety belts might rise to the level of negligence, but it is not evidence that Blackfoot failed to train him in the face of knowledge that there was a high probability that Roy would be injured if he did not use a belt. Therefore, Roy's contention concerning a lack of training in ladder safety fails to raise a genuine issue of material fact.

## ISSUE TWO

¶18    *Whether Blackfoot had a policy requiring the use of safety belts on ladders prior to Roy's injury.*

¶19    In his post-accident report James Harper noted that Roy should have used a safety belt. Roy argues that this is evidence that Blackfoot had a policy requiring linemen to use safety belts on aerial ladders. However, Harper was unclear in his deposition whether or not Blackfoot had such a policy on that specific point. Roy's former supervisor Al Williams, however, unequivocally stated that before Roy's injury Blackfoot did not have a policy mandating safety belts on aerial ladders. Also, Roy stated that in all his years on the job he

7

had never seen a lineman use a safety belt while performing mid-span aerial work. Furthermore, Blackfoot did provide him with the option of calling in a bucket truck if he thought his mid-span work would be too dangerous. With this evidence in mind, the only datum supporting Roy's claim is the post-accident statement of James Harper. However, Harper's brief assessment of why Roy fell does not establish a preexisting company-wide policy. Roy's own statement belies the existence of any such policy. Roy also gives as evidence the policy as it stood *after* Roy's injury. However, the policy appears to have developed as a result of Roy's fall, and therefore is not relevant. Therefore, there is no genuine issue of fact as to whether Blackfoot had a policy requiring the use of safety belts on aerial ladders.

## ISSUE THREE

¶20     *Whether industry standards and OSHA regulations gave notice to Blackfoot that there was a high probability Roy would be injured if he performed mid-line work on aerial ladders without a safety belt.*

¶21     Roy claims that there is an industry standard requiring the use of bucket trucks in performing mid-line work, or at least requiring safety belts when mid-line work is conducted with aerial ladders. Considering what we said above regarding the *Sherner* standard, Roy must not only establish that there was an industry standard, but also that Blackfoot knew of the standard, and that there was a high probability Roy would be injured and nevertheless did nothing to induce Roy to wear a safety belt.

¶22 Each party investigated the policies of other companies in the industry in Montana and in neighboring states. The parties came to very different conclusions as to whether there was a standard, and even differed on the practices of individual companies. For example, Roy's safety expert claimed that one company in particular did not conduct mid-span work and that if it did it would use a bucket truck because ladders are too dangerous. The same safety expert also testified that another company did occasionally perform mid-span work and that it required bucket trucks. Blackfoot's safety expert reached opposite conclusions, claiming that the same two companies both stated that they at least occasionally perform mid-span work and that they do not require bucket trucks.

¶23 If we assume that Roy is correct regarding the policies of the various companies, then the industry standard which arises is that bucket trucks, not safety belts, are required when performing mid-line work. However, this contradicts the OSHA standards discussed below. As will be seen, the OSHA standards clearly allow for the use of aerial ladders when performing mid-line work. Therefore, on the record before us, an industry standard on bucket trucks is at best unclear. *See Lynch v. Reed* (1997), 284 Mont. 321, 328, 944 P.2d 218, 222-23 (stating that if a standard adopted by a governmental agency has the force of law, then a standard that merely has "general acceptance in the industry concerned" does not). Furthermore, the record does not support Roy's contention that the industry standard requires use of safety belts while on an aerial ladder. Most of the companies that Roy's witness referenced do not even use aerial ladders for mid-line work. Those that do amount to no more than a handful. This small sample is not enough to establish an "industry

9

standard." As the District Court stated, when the industry standard is not clear there cannot be a finding of actual malice as a matter of law. *See Lopez v. Three Rivers Elec. Coop., Inc.* (Mo. 2000), 26 S.W.3d 151, 160-61 (concluding the industry standard was not sufficiently clear to warrant punitive damages in a negligence case); *Gee v. Egbert* (1984), 209 Mont. 1, 17, 679 P.2d 1194, 1202-03 (stating the industry standard was not sufficiently clear to imply malice to defendants). Therefore, Roy failed to establish that there was an industry standard as to the use of bucket trucks or safety belts on aerial ladders.

¶24 As for the OSHA regulations themselves, Roy argues that they mandate the use of safety belts on mid-span aerial ladders and that Blackfoot knew this. The OSHA regulations, however, are far from clear on the subject. 29 CFR § 1910.268(g)(1) states, "Safety belts and straps shall be provided and the employer shall ensure their use when work is performed at positions more than 4 feet above ground, on poles, and on towers . . . ." Roy contends that this language means that a worker must use safety straps whenever he is more than four feet above ground, and whenever he is on poles or on towers. Blackfoot counters that "on poles, and on towers" are the only two specific instances where the "4 feet" requirement applies, and that work on ladders is therefore not included.

¶25 There is nothing in the OSHA regulations which specifically requires the use of safety belts on ladders. However, Blackfoot points out that in the subsection titled "ladders," where one might expect such a specific requirement, the regulations require that aerial ladders must use hooks or extend two feet above the "aerial strand." 29 CFR § 1910.268(h)(7). (This is the section that defeats Roy's claim of an industry standard requiring use of bucket trucks,

10

as it allows for the use of ladders in mid-span work.) The level of specificity at work in 29 CFR § 1910.268(h)(7), coupled with the failure to include "ladder" in the more general 29 CFR § 1910.268(g)(1), does not amount to a clear OSHA standard requiring safety belts on ladders.

¶26 However, Roy counters by citing a 1988 Opinion Letter to a Connecticut cable company authored by OSHA's Director of Compliance Programs interpreting the regulations as requiring safety belts on ladders. There is no indication that Blackfoot was aware of this 1988 letter. If we were simply interpreting the regulations, we might be required to give deference to the agency's interpretation. *See, e.g.*, *Thomas Jefferson Univ. v. Shalala* (1994), 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405, 415. However, given that we are applying the *Sherner* malice standard, the question here is whether Blackfoot actually knew of the letter. With no evidence that Blackfoot was aware of the 1988 letter and given the unclear language of the Code of Federal Regulations, the record does not support a conclusion that Blackfoot acted with malice, that is, had knowledge of a high probability of injury and acted with intentional indifference to or disregard of that knowledge.

## CONCLUSION

¶27 Having disposed of Roy's four arguments as to whether Blackfoot meets the *Sherner* malice standard, we conclude that there is no genuine issue of material fact as to whether Blackfoot acted with intention or malice, as required by § 39-71-413, MCA (1999). Therefore, we affirm the District Court's award of summary judgment and its denial of Roy's

11

motion to alter or amend the judgment.  In doing so we also affirm the District Court's denials of Roy's family members' attendant claims.


/S/ W. WILLIAM LEAPHART


We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE