

DA 10-0182

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 93

PACIFICORP,

      Plaintiff, Appellee and Cross-Appellant,

  v.

STATE OF MONTANA, Department of Revenue,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis & Clark, Cause No. ADV 07-709
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Derek R. Bell, Special Assistant Attorney General, Montana Department
of Revenue, Helena, Montana

            Peter J. Crossett, Hiscock & Barclay, LLP, Syracuse, New York

      For Appellee:

            Michael Green, Crowley Fleck PLLP, Helena, Montana
David J. Crapo, Crapo Smith, Salt Lake City, Utah

                    Submitted on Briefs:  February 16, 2011
                               Decided:  May 4, 2011

Filed:

                _____
                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Montana Department of Revenue (Department) appeals the judgment of the First Judicial District Court, Lewis and Clark County, reversing the State Tax Appeal Board's (STAB) conclusion that the Department had applied a "commonly accepted" method to assess the value of PacifiCorp's Montana properties. PacifiCorp cross-appeals the District Court's conclusion that sufficient evidence existed in the record to support STAB's conclusion that additional obsolescence did not exist to merit further adjustments to the Department's original-cost-less-depreciation indicator of value.

¶2 We review the following issues on appeal:

¶3 *Does substantial evidence demonstrate common acceptance of the Department's direct capitalization method that derives earnings-to-price ratios from an industry-wide analysis?*

¶4 *Does substantial evidence support STAB's conclusion that additional obsolescence did not exist to warrant consideration of further adjustments to PacifiCorp's taxable value?*

FACTUAL AND PROCEDURAL BACKGROUND

¶5 The Department centrally assesses about 130 companies every year. The Department issued its final 2005 ad valorem assessment of PacifiCorp's Montana operating properties on May 26, 2005. PacifiCorp appealed the 2005 assessment to STAB. STAB upheld the Department's assessment after a six-day hearing. PacifiCorp appealed. The District Court rejected the Department's earnings-to-price ratios method

for appraising PacifiCorp's property and upheld the Department's conclusion that additional obsolescence did not exist.

¶6     PacifiCorp, a regulated electric utility company, owns electric generation property in Montana and nine western states. PacifiCorp provides electricity to 1.6 million consumers. PacifiCorp Holdings, Inc., a Delaware corporation, wholly owned PacifiCorp as of January 1, 2005. At that time, ScottishPower, a Scotland corporation, owned PacifiCorp Holdings, Inc.

¶7     ScottishPower announced on May 24, 2005, that it would sell all of the common stock that it owned in PacifiCorp to MidAmerican Energy Holdings Company (MidAmerican). MidAmerican agreed to purchase ScottishPower's common stock in PacifiCorp for $5.1 billion and assume approximately $4.3 billion of PacifiCorp's debt for a total sales price of $9.4 billion. The transaction closed on March 21, 2006.

¶8     The Department centrally assessed PacifiCorp's operating property in 2005 according to the unit method of valuation. The Department used four methods to calculate a correlated unit value for PacifiCorp's properties: (1) original cost less depreciation, (2) direct capitalization of net operating income, (3) direct capitalization of gross cash flow, and (4) yield capitalization. PacifiCorp takes no issue with the Department's calculations under the direct-capitalization-of-gross-cash-flow method or the yield-capitalization method.

¶9     The Department assessed PacifiCorp's value to be $8,581,317,664 according to the original-cost-less-depreciation method. The Department weighted the original-cost-

3

less-depreciation indicator at 50%. The Department's assessment based on the direct-capitalization-of-net-operating-income indicator yielded a value of $7,359,184,623. The Department weighted the direct-capitalization-of-net-operating-income indicator at 40%. The Department weighted the other two uncontested indicators at 5% each. The Department reached a $7,837,244,000 correlated unit value for PacifiCorp's properties.

¶10 The Department reduced the correlated unit value by 10% for non-taxable intangibles. Section 15-6-218, MCA; Admin. R. M. 42.22.110. The Department multiplied PacifiCorp's taxable value of $7,053,520,000 by a 1.5757 allocation percentage. The allocation percentage represents the value of PacifiCorp's Montana properties in relation to PacifiCorp's total value. The Department made other deductions and additions and concluded that PacifiCorp's Montana market value equaled $117,286,836. PacifiCorp does not challenge these other deductions and additions, the default 10% intangible deduction, or the 1.5757 allocation percentage.

¶11 PacifiCorp raised several issues before STAB regarding the Department's assessment. PacifiCorp challenged the Department's use of earnings-to-price ratios to calculate a direct-capitalization-of-net-operating-income indicator of value. PacifiCorp also argued that the Department's use of the original-cost-less-depreciation method did not comply with Montana law because the Department's method failed to adjust for obsolescence.

¶12 STAB heard lay and expert testimony from both parties during the six-day hearing. STAB decided that the Department had not overvalued PacifiCorp's properties.

4

STAB upheld the Department's use of earnings-to-price ratios. STAB agreed that no additional obsolescence existed, even though STAB concluded that the Department had not separately analyzed obsolescence. STAB noted that PacifiCorp's $9.4 billion sale to MidAmerican supported the Department's conclusion that no obsolescence existed to warrant additional deductions to the Department's appraised value of $7.8 billion.

¶13    PacifiCorp appealed to the District Court. The court reversed STAB's decision regarding the earnings-to-price ratios method based on the court's conclusion that substantial evidence did not show common acceptance of the method. The court further determined that STAB wrongly had relied on the sales price of PacifiCorp to MidAmerican. The court concluded nonetheless that substantial, credible evidence in the record otherwise supported STAB's decision that no economic obsolescence existed.

¶14    The Department now appeals the court's conclusion regarding its use of earnings-to-price ratios. PacifiCorp cross-appeals the conclusion that no additional obsolescence existed to merit an additional deduction.

STANDARD OF REVIEW

¶15    We review a district court's conclusions of law for correctness. *State v. PPL Mont., LLC,* 2007 MT 310, ¶ 19, 340 Mont. 124, 172 P.3d 1241. We review a district court's order affirming or reversing an administrative decision of STAB to determine whether the findings are clearly erroneous and to determine whether STAB correctly has interpreted the law. *Id.* We defer to STAB's findings unless they are clearly erroneous, because STAB is particularly suited for settling disputes over the appropriate valuation of

5

property.  *Id.* at ¶ 45.  A decision of STAB may be reversed or modified if STAB's findings, inferences, or conclusions are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.  *Dept. of Revenue v. Grouse Mt. Dev.*, 218 Mont. 353, 355, 707 P.2d 1113, 1115 (1985).

DISCUSSION

¶16  *Does substantial evidence demonstrate common acceptance of the Department's direct capitalization method that derives earnings-to-price ratios from an industry-wide analysis?*

¶17  The Department must assess all of a company's taxable property at 100% of its market value.  Section 15-8-111(1), MCA.  For the 2005 tax year, the Department centrally assessed PacifiCorp's value according to the unit method of valuation.  Section 15-23-101, MCA; Admin. R. M. 42.22.102 to 42.22.111.  The unit method of valuation calculates the value of a business's entire operating system as a going concern and as a single entity, including all tangible and intangible operating assets of the company.  Admin. R. M. 42.22.101(30)-(31).  The unit method authorizes the appraiser to consider cost, income, and market approaches to determine a business's market value.  Admin. R. M. 42.22.111(1).  The appraiser then applies correlation percentages to the different approaches to establish an overall system market value.  Admin. R. M. 42.22.111(2)-(3).

¶18  The Department must make its tax assessment according to commonly accepted methods and techniques for determining market value.  Admin. R. M. 42.22.111(1).  The Department used the direct-capitalization-of-net-operating-income method as one of its

four appraisal methods. This method calculates a company's value by dividing the company's annual income by a "capitalization rate." PacifiCorp does not dispute that the direct-capitalization-of-net-operating-income method has been commonly accepted as a valuation method. PacifiCorp disputes the Department's use of earnings-to-price ratios in determining the capitalization rate.

¶19 The Department typically derives a capitalization rate from comparable sales of similar properties. The unavailability of comparable sales information required the Department to use earnings-to-price ratios to calculate the capitalization rate for PacifiCorp's assessment. The Department followed the band of investment theory to derive a weighted average direct capitalization rate. Admin. R. M. 42.22.114(2). The band of investment theory compares the capital structure of businesses in the same industry with the capital structure of the assessed company, including comparisons of common equity, preferred stock, and debt.

¶20 The Department separately had conducted its 2005 industry-wide Capitalization Rate Study for Electric Utilities. The Department relied on the study for PacifiCorp's assessment. The Department first selected comparable companies from the electric utility industry group in the Value Line Investment Survey. The Department then collected data related to those companies' earnings and stock prices. The Department gathered its "earnings" data from the Value Line Investment Survey and its "price" data from Yahoo Finance. The Department used this information to derive earnings-to-price ratios. Earnings-to-price ratios represent the annual earnings per share of common stock divided

by the average market price per share for common stock. The Department's earnings-to-price ratios represent, in its estimation, the calculations that would be used by willing buyers and sellers of electric utilities in the market. The Department used the earnings-to-price ratios to derive a capitalization rate of 6.5% that would be used in PacifiCorp's assessment.

¶21    The Department must rely on information derived from industry-wide analyses in part because the Department has no other way to obtain more relevant information for its tax assessment. The Department obtained some information from PacifiCorp's property tax manager, Norman Ross, at an informal hearing. Otherwise the Department had to rely on information from PacifiCorp's public filings with the Federal Energy Regulatory Commission (FERC) and the Securities and Exchange Commission (SEC).

¶22    Sections 15-23-103 and 15-23-301, MCA, required PacifiCorp to file its return with the Department by March 31, 2005, and to provide the Department with the information needed to prepare the assessment. Admin. R. M. 42.22.105. PacifiCorp filed its return on March 30, 2005, but did not provide all the information requested by the Department for the preparation of its assessment. STAB catalogued the missing items in one of its findings. These missing items included a finalized FERC Form 1, the Montana Form E-47, information on PacifiCorp's projected cash flows, and other documents. The Department, as a result of the missing items, turned to its industry-wide capitalization rate study and the income method to derive an estimate of PacifiCorp's value on the information otherwise available.

¶23    As a regulated electric utility, PacifiCorp must file financial information with FERC. PacifiCorp provides audited statements of its financial status in a public filing called FERC Form 1. The Department used information from PacifiCorp's 2003 and 2004 FERC Form 1 filings to calculate PacifiCorp's average net operating income of $462 million. The Department divided PacifiCorp's average net operating income by the 6.5% capitalization rate to reach an estimated value for PacifiCorp of $7.1 billion. The Department made additional adjustments and reached a direct-capitalization-of-net-operating-income indicator of $7.3 billion.

¶24    PacifiCorp argues on appeal that other jurisdictions and appraisal textbooks generally have not accepted the use of an industry-wide analysis to derive a capitalization rate for appraising centrally assessed utility properties. The Department counters that expert testimony, textbook authority, and the Department's long-standing practice support its use of earnings-to-price ratios in calculating value. We agree.

¶25    Department employees and expert witnesses testified in support of the Department's use of earnings-to-price ratios. Department employees testified that the earnings-to-price ratios represent a standard methodology that the Department has used for several industries over several years. The Department's witnesses identified the Unit Valuation Standards of the National Conference of Unit Value States (NCUVS) as the Department's authority for use of the earnings-to-price ratios method. The Department admitted NCUVS's Unit Valuation Standards as a trial exhibit.

¶26 The Department presented the expert testimony of Brent Eyre, an Accredited Senior Appraiser with the American Society of Appraisers. Eyre testified that the earnings-to-price ratios method has been used widely to appraise centrally-assessed companies. He testified that 36 or 37 states conduct unit valuations of centrally assessed properties. Eyre confirmed that the NCUVS standards provide the basis for using earnings-to-price ratios in appraising property owned by centrally assessed companies. Eyre provided that the Department performed the "correct analysis" when it analyzed earnings-to-price ratios to derive a capitalization rate in light of the fact that complete sales of electric companies rarely occur. Eyre cited three appraisal textbooks that support use of the earnings-to-price ratios method under these circumstances, including one textbook described as "one of the most widely read textbooks on corporate valuation."

¶27 Eyre also authored an expert report that evaluated the Department's appraisal. Eyre's report validated the Department's use of earnings-to-price ratios. Eyre conducted an independent appraisal of PacifiCorp. Eyre analyzed thirteen selected guideline companies and derived a capitalization rate of 6.3%. The Department had derived a rate of 6.5%. The similarity in rates, as well as Eyre's expert testimony and report, supports the reasonableness and validity of the Department's appraisal method.

¶28 The Department's expert, James Ifflander, also testified that the Department appropriately calculated value according to the direct-capitalization-of-net-operating-income method. Ifflander provided that sound financial theory supported the Department's method. Ifflander explained that financial analysts and investment banks

routinely use earnings-to-price ratios to derive values of complex, integrated units, such as PacifiCorp. Both sophisticated buyers and sellers of electric utility assets, according to Ifflander, widely use the method employed by the Department. Ifflander provided three examples of mergers of electric utility companies where the parties had calculated value according to an earnings-to-price ratios method. Ifflander testified that even MidAmerican had used an earnings-to-price ratios method similar to the Department's when it sought to determine a value for its 2006 purchase of PacifiCorp.

¶29 PacifiCorp challenged the Department's earnings-to-price ratios method. PacifiCorp's tax manager, Norman Ross, testified that none of the other states in which PacifiCorp operates used an earnings-to-price ratios method like that used by the Department in 2005. PacifiCorp's experts Hal B. Heaton and Thomas Tegarden testified that the general appraisal literature did not support the Department's use of earnings-to-price ratios in the direct capitalization method.

¶30 The District Court concluded that the NCUVS standards provided weak authority for upholding the Department's use of earnings-to-price ratios as a commonly accepted methodology. The court specifically expressed concern with an "admission" made by the Department's expert, Wilson, that he had not heard of NCUVS. Our review of the record reveals, however, that Wilson's "admission" arose randomly in the middle of unrelated testimony regarding depreciation and obsolescence. PacifiCorp's counsel stated immediately after Wilson's "admission" that he would follow-up on "that in just one

moment then." PacifiCorp failed to follow-up or ask Wilson about the "acceptance" of using earnings-to-price ratios by the appraisal community.

¶31 Wilson's expertise included public utility company issues, especially those issues relating to rate regulation. Wilson testified for the Department regarding whether the Department should have included obsolescence in its assessment of PacifiCorp. We disagree with the District Court that Wilson made an "admission" on the separate issue of the appropriateness of earnings-to-price ratios in the Department's assessment of PacifiCorp that requires reversal of STAB's conclusion. The remaining evidence in the trial record supports STAB's determination.

¶32 For example, the Department's expert on earnings-to-price ratios, Brent Eyre, testified that the NCUVS standards promoted the use of earnings-to-price ratios. Further, the Department admitted the NCUVS standards into evidence as a trial exhibit. The NCUVS standards explicitly advocate for the use of earnings-to-price ratios in a direct capitalization model. Other Department witnesses testified regarding their familiarity with NCUVS, including Kory Hofland, who currently served as the vice chair of NCUVS, and Department expert, James Ifflander, who had presented at NCUVS conferences. We disagree with the District Court that the isolated, out-of-context "admission" by Wilson, who testified primarily on obsolescence, provides grounds to reverse STAB's decision.

¶33 The District Court also relied on testimony from PacifiCorp's expert, Hal Heaton, that four other states disfavored use of the earnings-to-price ratios in the direct

12

capitalization method. Heaton's testimony and his accompanying trial exhibit demonstrate that these states disfavored use of the method based on their concern that it too effectively captures the value of non-taxable intangible property and overestimates the taxable value of a company. The District Court misapprehended the record when it assumed that these other states disfavored the method because it caused inaccurate assessments altogether.

¶34 Montana appraisers initially must assess a business's entire operating system, including intangibles, at 100% market value and then deduct and adjust for exempt properties like intangibles. Sections 15-8-111, 15-6-218, MCA. Montana's mandate to appraise at 100% market value makes an approach that effectively captures intangible value all the more favorable. As the Department's expert, Brent Eyre, explained, these other states' concern that the earnings-to-price method too effectively accounts for non-taxable intangible value *further supports* the Department's use of the method in fulfilling its statutory mandate to appraise initially at 100% market value.

¶35 The court also failed to recognize Eyre's explanation that the states identified by Heaton may have statutory schemes that adjust for intangible value differently than Montana's. Eyre compared Montana and Utah as an example. Both Utah and Montana exempt intangible property from taxation. Unlike Montana's requirement to initially value at 100% market value, however, Utah's statutory scheme requires the appraiser to exclude the value of exempt intangible property throughout its initial assessment. Eyre's explanation of the statutory distinction illustrates why some states may disfavor the direct

13

capitalization approach that relies on earnings-to-price ratios. We also point out that neither Heaton, nor PacifiCorp's other experts, offered a counter argument to Eyre's explanation.

¶36 STAB sat in the best position to draw a conclusion from conflicting evidence. *PPL Mont., LLC,* ¶ 45. The District Court exceeded its scope of review and second-guessed STAB's decision. Section 2-4-704(2), MCA. The Department's lay and expert witness testimony, expert reports, and trial exhibits comprise substantial evidence to uphold STAB's conclusion that the Department's earnings-to-price ratios method of valuation has been commonly accepted in the appraisal community.

¶37 *Does substantial evidence support STAB's conclusion that additional obsolescence did not exist to warrant consideration of further adjustments to PacifiCorp's taxable value?*

¶38 Section 15-8-111(2)(b), MCA, requires that the Department "shall fully consider reduction in value caused by depreciation, whether through physical depreciation, functional obsolescence, or economic obsolescence." PacifiCorp argued during the STAB hearing that the Department had failed to "fully consider" and adjust for obsolescence. PacifiCorp specifically faulted the Department for not conducting a separate study on obsolescence that might have unveiled additional deductible obsolescence not accounted for under the Department's original-cost-less-depreciation method of appraisal.

14

¶39 STAB concluded that the Department had failed its statutory duty to "fully consider reduction" in value for obsolescence. Nonetheless, STAB concluded that the Department's $7.1 billion appraisal reasonably reflected PacifiCorp's taxable value as shown by substantial evidence in the record and the $9.4 billion sales price. The District Court reversed in part and affirmed in part. The court reversed STAB's conclusion that STAB could consider the $9.4 billion sales price to verify the reasonableness of the $7.1 billion appraisal. The court affirmed STAB's decision to uphold the Department's $7.1 billion appraisal, however, based on substantial evidence in the record that otherwise supported the Department's conclusion that additional obsolescence deductions were not warranted.

¶40 PacifiCorp now raises three challenges to the Department's treatment of obsolescence. PacifiCorp first argues that the Department neglected its affirmative duty under § 15-8-111(2)(b), MCA, to measure for obsolescence and make additional deductions. Second, although PacifiCorp did not appeal STAB's rejection of the income shortfall method—the method advanced by PacifiCorp to demonstrate that about $2.6 billion worth of additional obsolescence existed—it argues that rejection of that method cannot be used as affirmative evidence that obsolescence did not exist. PacifiCorp finally argues that STAB placed too much reliance on the $9.4 billion sales price to verify the reasonableness of the $7.1 billion tax appraisal. PacifiCorp bears the burden of showing that the Department's method resulted in an overstated value of its properties. *Farmers Union C. Exch. v. Dept. of Revenue,* 272 Mont. 471, 474, 901 P.2d 561, 564 (1995).

15

¶41    PacifiCorp bases its first argument that the Department neglected its affirmative duty under § 15-8-111(2)(b), MCA, on its theory that the Department should have separately conducted a depreciation study to consider whether additional obsolescence existed.  STAB found that Angie Haller, the Department's utility assessor, deducted $5.81 billion for depreciation as reported in PacifiCorp's FERC Form 1 filing.  STAB found that Haller did not have any evidence of additional depreciation and did not conduct any additional studies.  STAB found that Haller believed that the depreciation deduction that she had made in accordance with PacifiCorp's FERC Form 1 reporting accounted for all forms of depreciation, including obsolescence.  Haller did not believe that the statute charged the Department "to go out and perform" additional depreciation studies.

¶42    Haller used information reported by PacifiCorp on FERC Form 1 to complete the original-cost-less-depreciation method of appraisal.  She took the "original cost" value of $13.6 billion from PacifiCorp's FERC Form 1.  She relied on PacifiCorp's reported depreciation value of $5.81 billion from PacifiCorp's FERC Form 1.  Haller subtracted the reported depreciation value from the reported original cost value, made other adjustments, and reached a value indicator of $7.7 billion.  PacifiCorp does not dispute the propriety of Haller's reliance on these figures from FERC Form 1.

¶43    Haller's supervisor, Kory Hofland, testified that the federal definition of depreciation that PacifiCorp used in its FERC Form 1 reporting included both functional and economic obsolescence.  The federal definition of depreciation for the FERC filings

16

includes "wear and tear, decay, action of the elements, inadequacy, *obsolescence*, changes in the art, *changes in demand* and *requirements of public authorities*." 18 C.F.R. pt. 101, def. 12 (2010) (emphasis added). Hofland testified that Haller's depreciation deduction in reliance on PacifiCorp's FERC filings accounted for all depreciation, including obsolescence, under the Department's original-cost-less-depreciation method. Hofland further testified that an appraiser's adjustment both for depreciation as deducted by Haller and for obsolescence as proposed by PacifiCorp would have resulted in obsolescence having been deducted twice.

¶44 Depreciation studies by PacifiCorp's accountants as part of the FERC Form 1 filing reported that PacifiCorp's properties had depreciated $5.81 billion. As the Department observes, the $5.81 billion of depreciation reported by PacifiCorp would have included the types of economic forces that PacifiCorp claims could result in a loss of value, such as "changes in demand and requirements of public authorities." *Id.* PacifiCorp would have the Department undertake a similar depreciation study to determine whether additional obsolescence existed that PacifiCorp's accountants had failed to account.

¶45 The Department employed three appraisers to assess annually the roughly 130 companies subject to central assessment. Haller and Hofland testified that they have never conducted or ordered a full depreciation study like the analysis that PacifiCorp would have them do. Haller and Hofland rely on the taxpayers' public filings. They further testified that taxpayers have an opportunity to provide information regarding

additional depreciation. Haller and Hofland testified that they would make further reductions or adjustments if a taxpayer could show that additional depreciable value existed.

¶46 Haller released her initial appraisal for PacifiCorp on April 29, 2005. PacifiCorp had an opportunity to respond to the initial appraisal and provide additional information. PacifiCorp responded with written submissions, participated in an informal hearing with the Department, and exchanged several emails with Haller. PacifiCorp asserted at these opportunities that the Department had failed to capture physical, functional, and economic obsolescence. PacifiCorp did not provide the Department, however, with a figure for how much obsolescence had not been captured. PacifiCorp likewise does not suggest on appeal that any additional obsolescence would have been found had further study been undertaken. PacifiCorp only provided the Department with an estimate of what PacifiCorp believed its taxable value should be.

¶47 PacifiCorp argued to STAB that about $2.6 billion of additional obsolescence existed. PacifiCorp based its argument on the testimony and report of its expert, Thomas Tegarden. Tegarden calculated obsolescence according to the income shortfall method. STAB rejected Tegarden's income shortfall approach because, among other reasons, it failed to account for income from properties that PacifiCorp had purchased with deferred income taxes. PacifiCorp has not challenged that decision. It contends on appeal, however, that STAB's rejection of the income shortfall method cannot be used as affirmative evidence that obsolescence did not exist.

¶48 Nothing in the record indicates that STAB used the rejection of the income shortfall method as affirmative evidence. STAB rejected the income shortfall method for its inaccuracies. Absent the evidence based on the rejected income shortfall method, STAB had no evidence before it that suggested that unaccounted-for obsolescence existed. Though PacifiCorp suggests that other methods remained available to measure obsolescence, it failed to present evidence of such alternative methods or any other evidence of additional obsolescence. PacifiCorp failed its burden of showing that the Department's original-cost-less-depreciation method resulted in an overstated value of its properties. *Farmers Union C. Exch.,* 272 Mont. at 474, 901 P.2d at 564.

¶49 Given the absence of evidence that any alternative methods available to measure for obsolescence would have produced a different result once STAB rejected the income shortfall method, and given STAB's further finding that no economic obsolescence existed, we disagree with STAB's conclusion that the Department failed to fully consider all forms of depreciation in this case. STAB's sole finding of fact that "Haller did not do any additional study or analysis to determine if there was additional depreciation" does not support STAB's conclusion that the Department abrogated its obligation to "fully consider reduction in value caused by depreciation." We also point out that STAB prefaced this finding of fact with the explanation that "Ms. Haller did not have any evidence of additional functional depreciation," which resonates with Haller's testimony that she did not order an additional study because nothing indicated that unaccounted-for depreciation existed.

¶50 STAB nonetheless concluded that "[t]he Department's appraiser testified that she did not specifically analyze whether all forms of obsolescence, including economic obsolescence, existed." STAB's conclusion that Haller did not "specifically analyze" does not follow from its finding that Haller "did not do any additional study or analysis." We have searched the record to understand the basis for STAB's determination on this issue. The record contains no factual evidence or legal argument to support STAB's conclusion that the Department must "specifically analyze" obsolescence and failed to do so in this case. To the contrary, Haller testified that she did not believe the statute "charged [the Department] to go out and perform" additional obsolescence studies to fulfill its obligation to "fully consider reduction."

¶51 The Concurrence correctly notes that this Court often gives deference to STAB's expertise on taxation matters. *See e.g.* Opinion, ¶¶ 15, 36. Such deference does not allow STAB, however, to make legal determinations unmoored from its own findings and the evidence in the record. PacifiCorp urged STAB to adopt the income shortfall method to measure possible obsolescence. STAB rejected this method. PacifiCorp bore the burden of proving the Department's method inadequate. PacifiCorp came forward with no evidence of additional obsolescence that the Department had failed to analyze.

¶52 The Concurrence believes it "unwise" to determine whether the Department satisfied its statutory duty to "fully consider reduction" because the Department has not appealed STAB's erroneous conclusion on this point. We disagree. PacifiCorp raised the obsolescence issue before STAB, the District Court, and this Court. STAB and the

District Court concluded that the Department failed to analyze obsolescence adequately, but both ruled in the Department's favor anyway. The Department's decision not to appeal the erroneous conclusions makes sense in light of the fact that it prevailed on this issue before STAB and the District Court.

¶53 PacifiCorp specifically asserted as its first argument in its cross-appeal to this Court that "the Department ignored its affirmative, statutory duty to fully consider obsolescence in the cost approach." PacifiCorp's Opening Br. 33. The Department argued in response that it had considered the effects of obsolescence when it calculated value under its original-cost-less-depreciation approach. The parties have raised, argued, and briefed the issue of whether the Department fulfilled its statutory obligation to "fully consider reduction in value" before STAB, the District Court, and this Court. The record and the briefs do not support the Concurrence's assertion that they have not. The Concurrence focuses solely on PacifiCorp's statement of the issue at the start of its brief. Concurrence, ¶ 66. PacifiCorp's three-part argument set out at pages 33-40 of its brief specifically argues that the Department ignored its statutory duty to consider obsolescence. The Concurrence fails to explain why the Court should refuse to address PacifiCorp's argument that "the Department ignored its affirmative, statutory duty."

¶54 The Department only has requested that this Court affirm the District Court. We may affirm a district court decision that is correct regardless of the district court's reasoning in reaching its decision. *Conagra, Inc. v. Nierenberg*, 2000 MT 213, ¶ 33, 301 Mont. 55, 7 P.3d 369. We affirm the District Court, but we will not affirm its adoption of

21

STAB's incorrect determination that the Department had failed to analyze all forms of depreciation.

¶55    PacifiCorp finally argues that STAB placed too much reliance on the May 24, 2005, sales price. STAB concluded that PacifiCorp's $9.4 billion sales price provided a good indication that additional obsolescence did not exist to merit additional deductions to the Department's tax assessment of $7.1 billion. STAB found that the $9.4 billion sales price reflected the market value as defined in § 15-8-111, MCA, that the sale constituted an arm's length transaction, and that no evidence suggested that PacifiCorp's value materially had changed between the tax lien date and the closing of the transaction. STAB concluded that it could rely on PacifiCorp's $9.4 billion sales price "to verify the essential reasonableness of the Department's final estimate of value" of $7.1 billion.

¶56    The District Court rejected STAB's conclusion that STAB could consider the sales price of PacifiCorp. The court relied on Thomas Tegarden's statement that an appraiser generally may consider only information known or knowable as of the assessment lien date. The court concluded that this known or knowable principle applied to STAB. We disagree.

¶57    Section 15-7-102(6), MCA, expressly authorizes STAB to "consider the actual selling price of the property, independent appraisals of the property, and other relevant information" in determining the market value of the property. The court disregarded this statute because PacifiCorp had announced the sale on May 24, 2005, about five months

after the tax lien date of January 1, 2005. The court incorrectly interpreted § 15-7-102(6), MCA.

¶58 PacifiCorp's appeal of the Department's appraisal required that STAB hear the appeal and render a final, binding decision. Sections 15-2-201(d), -302(5), MCA. STAB had the authority to issue summonses to witnesses, to administer oaths, and to compel testimony and the production of records, books, and other documents. Section 15-2-201(2), MCA. STAB must hear the appeal in accordance with the contested case provisions of the Montana Administrative Procedure Act. Section 15-2-302(4), MCA. This Court has concluded that STAB must be able to receive additional testimony and evidence to perform its duty to hear the appeal and issue a final decision. *Dept. of Revenue v. Burlington N. Inc.*, 169 Mont. 202, 213, 545 P.2d 1083, 1089 (1976). STAB properly considered the $9.4 billion sales price of PacifiCorp to MidAmerican in evaluating the reasonableness of the Department's $7.1 billion assessment.

## CONCLUSION

¶59 We affirm in part and reverse in part. Substantial evidence supports the Department's use of earnings-to-price ratios in its direct capitalization approach. We affirm the District Court's conclusions that additional depreciation deductions were not warranted and that the Department did not overvalue PacifiCorp's property.

¶60 We hold that § 15-8-111(2)(b), MCA, does not require the Department to conduct a separate, additional obsolescence study when no evidence suggests that obsolescence exists that has not been accounted for in the taxpayer's FERC Form 1 filing. We further

hold that STAB correctly determined that the actual $9.4 billion sales price of PacifiCorp verified that the Department's $7.1 billion assessment had not overvalued PacifiCorp's properties.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER

Justice Jim Rice, concurring.

¶61 The Department challenges the District Court's reversal of STAB's finding that earnings-to-price ratios may be used within the "direct capitalization of net operating income" method of valuation under Admin. R. M. 42.22.111. This regulation requires the Department to employ "commonly accepted methods and techniques of appraisal to determine market value." Admin. R. M. 42.22.111(1). PacifiCorp defends the District Court's determination and argues that STAB's finding was not supported by substantial evidence. Neither a definition nor standards which further explain the term "commonly accepted method" are provided within the regulations, but an agency's interpretation of its own regulation is entitled to deference. *See Roy v. Blackfoot Tel. Coop.*, 2004 MT 316, ¶ 26, 324 Mont. 30, 101 P.3d 301 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386 (1994) ("We must give substantial deference to an

agency's interpretation of its own regulations.")).  In light of the deference to be given to the Department's application of its regulation and the evidence discussed by the Court, I concur that STAB's finding was supported by substantial evidence.[1]

¶62    In the cross appeal, PacifiCorp challenges the District Court's affirming of STAB's obsolescence determination, arguing that the Department's approach failed to satisfy the requirement in § 15-8-111(2)(b), MCA, to "fully consider" both functional and economic obsolescence.  The Court delineates testimony which was offered by the Department in support of its treatment of obsolescence, Opinion, ¶¶ 41-46, and then reverses both STAB and the District Court's legal conclusion that the Department failed to properly consider obsolescence.  Opinion, ¶ 49.  I have concerns about the Court's approach and cannot agree with it.

¶63    The evidence cited by the Court was considered by STAB during the proceedings before it.  STAB concluded that the Department "fail[ed] to consider economic obsolescence in its cost indicator as specifically required by statute.  Section 15-8-111(2)(b), MCA. . . . '[T]he Board does not condone this failure on the part of the Department.  There is a clear statutory duty for the Department to consider all forms of depreciation . . . .'"  STAB Order, 35 (internal citation omitted); *see also* STAB Order, 33.  The District Court affirmed this conclusion, stating that "the Department's cost approach calculation did *not* include a separate consideration of any reduction in value

---

[1] In fairness to the District Court, its decision was premised on what it described as the Department's failure to "*cite the Court* to any testimony or exhibit establishing that the earnings-to-price ratio method . . . is a commonly accepted method of determining market value," noting that the transcript ran over 1,200 pages.  District Court Order, 15 (emphasis added).  The Department's argument, and not the evidence, may have been lacking in the District Court.

25

for obsolescence." District Court Order, 10 (emphasis added). Then, the Department *did not appeal* this determination. The obsolescence issue undertaken by the Court—on which it reverses STAB and the District Court—has not been challenged on appeal and is not the focus of the parties' briefing.

¶64 STAB ultimately concluded that the error in the Department's valuation method was essentially harmless under the circumstances, because post-lien date sale information demonstrated that no additional obsolescence existed. Nonetheless, STAB warned that "[i]n other cases, the Department's failure to consider economic obsolescence in its cost approach could prove seriously detrimental to the Department's valuation." STAB Order, 35. I believe that the Court's wading into this issue is unwise. The Court is reversing complex evidentiary determinations which were not the focus of the appeal, were not briefed, and which fall within the expertise of the taxing authorities. I would not do so.

¶65 In response, the Court offers the vague assertion that the parties "have raised, argued, and briefed the issue of whether the Department fulfilled its statutory obligation to 'fully consider reduction in value' before STAB." Opinion, ¶ 53. A careful search of the briefing would be a vain attempt to locate where this issue was "raised, argued and briefed" in this case. The "obsolescence" issue which the Court reaches and decides today—the proper interpretation of § 15-8-111(2)(b), MCA, and the requirements it imposes upon the Department regarding obsolescence—was certainly not raised or briefed on appeal. There is no analysis whatsoever, in any of the briefing, from either

26

party, about the text, history, or meaning of § 15-8-111(2)(b), MCA, or the obligations imposed by that statute.

¶66 The Department's opening brief made only a passing reference to § 15-8-111(2)(b), MCA, and its reply and response brief did not make a single reference to the provision. While referencing obsolescence in the context of the issue it did raise, PacifiCorp offers no argument about obligations imposed by the statute regarding obsolescence. To obscure this fact and support its desire to interpret the statute, the Court resorts to restating the parties' actual issues. The Court states that "PacifiCorp specifically asserted as its first argument in its cross-appeal to this Court that 'the Department ignored its affirmative, statutory duty to fully consider obsolescence in the cost approach.'" Opinion, ¶ 53. This is an incomplete statement of PacifiCorp's position. Its actual issue is "whether the district court erred when it affirmed the Department's cost indicator *even though* the Department willfully failed to consider obsolescence." PacifiCorp's Opening Brief, 1 (emphasis added). Because the Department had failed to appeal the interpretation of § 15-8-111(2)(b), MCA, rendered by STAB and the District Court, PacifiCorp based its arguments solely on the assumption that this statutory interpretation was correct. To top it off with the appropriate irony, the Court criticizes this Concurrence for failing to acknowledge "PacifiCorp's three-part argument set out at pages 33-40 of its brief" which "specifically argues that the Department ignored its statutory duty to consider obsolescence." Opinion, ¶ 53. However, there is no such discussion in the cited pages of PacifiCorp's brief. There is

27

such a discussion in those numbered pages of the District Court's order—and that is precisely the point: the Department did not appeal from that discussion and thus no briefing has been offered here by the parties on the issue.

¶67 The Court's decision today blindsides the parties, but prejudices PacifiCorp, which loses on the basis of an issue it never briefed. PacifiCorp did not brief the statutory interpretation issue because, under the statutes and rules governing the appeal process, it was unnecessary to do so. Today, PacifiCorp has learned the hard way that it cannot place its trust in the rules governing the appellate process in Montana.

¶68 Finally, the Court approves STAB's consideration of the post-lien date sale information, citing § 15-7-102(6), MCA, which permits STAB to consider "the actual selling price of the property." As the statute does not differentiate between pre- and post-lien date sale information, I concur that STAB could properly consider this evidence, despite the fact that consideration of post-lien date sale information apparently contradicts what the District Court described as "a well accepted rule" in the appraisal industry. If the statute does not reflect best industry practices, it may need to be revised. However, it serves today to render any flaw in the Department's cost approach as harmless error.

¶69 I concur in the result reached by the Court.

/S/ JIM RICE

Justice James C. Nelson joins in the concurring Opinion of Justice Jim Rice.

/S/ JAMES C. NELSON

28

Justice James C. Nelson, specially concurring.

¶70 I join Justice Rice's Concurrence. His comments at ¶¶ 65 to 67 are correct. Unfortunately, this is not the first time in recent experience that this Court has taken a case and reframed the issues, arguments, and theories on appeal to achieve a particular disposition—in the process, blindsiding the losing party with an issue it never raised or briefed. This is exactly what happened in *Western Sec. Bank and Glacier Bancorp, Inc. v. Eide Bailly LLP*, 2010 MT 291, 359 Mont. 34, 249 P.3d 35. In that case, appellant Glacier Bancorp alleged, litigated, and argued a professional negligence claim, not the negligent misrepresentation claim this Court decided on appeal. *Western Sec. Bank*, ¶¶ 72-82 (Nelson, J., concurring in part and dissenting in part). As I observed there, "[i]t will surely come as a surprise to Glacier . . . when it learns that it has lost this case because it failed to adequately support a claim that it never even raised!" *Western Sec. Bank*, ¶ 73. I have no doubt that Pacificorp will be equally astonished.

/S/ JAMES C. NELSON